UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAWRENCE K. LaCOURSE,

               Plaintiff,

v.                                           Case Number 05-73613
                                           Honorable David M. Lawson

GRS III L.L.C. d/b/a GONZALEZ CONTRACT
SERVICES, RAYTHEON COMPANY d/b/a
RAYTHEON, and GRAHAM JACKSON,

               Defendants.

_____/

## OPINION AND ORDER GRANTING RAYTHEON AND JACKSON'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART GONZALEZ'S MOTION FOR SUMMARY JUDGMENT

      The plaintiff filed his complaint in Oakland County Circuit Court on August 26, 2005 against

the defendants alleging, among other things, violations of the Fair Labor Standards Act. State law

claims also were alleged. The defendants removed the case to this Court on September 20, 2005,

and thereafter they filed motions for summary judgment. Defendant GRS III, L.L.C., doing business

as Gonzalez Contract Services (Gonzalez), argues that the plaintiff is exempt from the FLSA, and

it attacks the other claims on grounds discussed below. Defendants Raytheon Company and Graham

Jackson make those same arguments, and in addition they argue that they were not employers for

purposes of the FLSA. The Court heard oral argument on the motions on November 21, 2006. The

Court now finds as to defendants Raytheon and Jackson that the undisputed evidence establishes that

the plaintiff is an exempt employee, and therefore their motion for summary judgment will be

granted. However, because defendant Gonzalez inexplicably admitted in its answer that the plaintiff

is an hourly employee, Gonzalez is bound by that admission, and an employee cannot be exempt if

he is not paid on a salary basis. Therefore, the Court will deny Gonzalez's motion for summary

judgment on the FLSA count, but grant it on the remaining counts because Gonzalez is entitled to judgment on those claims as a matter of law.

I.

The plaintiff is a training consultant who works as a contract employee to develop manufacturing and repair methods and systems on new products for automotive manufacturers. Although it appears that the plaintiff maintained essentially the same job throughout the period at issue in this lawsuit, his employment history is somewhat complicated due to the changes in relationships between the manufacturer and the contracting companies that actually employed the plaintiff. The plaintiff's actual hours worked typically varied from week to week, and the facts establish that during many weeks he work more than forty hours. He contends that throughout his employment, he was paid on an hourly basis, and he was not compensated by the defendants at time-and-a-half for the hours in excess of forty as required by section 207 of the FLSA, 29 U.S.C. § 207(a)(1).

The plaintiff was a contract worker who generally performed his services at automotive manufacturing plants. General Motors Corporation and other car makers employ "end of the line" repair technicians who repair defective or malfunctioning products. The General Motors employees making the repairs are hourly employees and union members. General Motors provides these workers with training on the latest product features, the problems those features may generate, methods for diagnosing those problems, and the appropriate protocols for repairing them.

According to the defendants, General Motors contracted with defendant Raytheon Professional Services, L.L.C., to develop those protocols and provide that plant training. Raytheon in turn contracted with employment firms, like defendant Gonzalez, or Cosworth Engineering, to

-2-

supply the plant training consultants.  The employment firm would assign the consultants to particular General Motors plants.  The plaintiff, who had studied industrial design and fine art for three years at the Center for Creative Studies, was hired in 1992 as a plant training consultant by Cosworth Engineering, who is not a party to this suit.  Cosworth assigned the plaintiff to a Ford facility until March 1997, when the plaintiff was asked to work at a General Motors facility. He started at the General Motors plant on March 3, 1997 doing similar work as at Ford.  The plaintiff also had a desk at Raytheon's office.  Graham Jackson, a Raytheon supervisor to whom the plaintiff reported, testified that the plaintiff was not a Raytheon employee.

The plaintiff avers that as a Cosworth employee at Ford, he was always paid by the hour and received an overtime premium.  He says that when he moved to the General Motors plant, Mike Pryce, a Cosworth employee, and Jean Hart and Bob Martin, General Motors employees, agreed to a compensatory time system "for excessive hours worked."  "Comp time in that situation meant the trainers could take time off instead of overtime pay.  Excessive hours were determined to be anything over forty (40) hours per week."  Pl.'s Resp. Br. Ex. 1, LaCourse Aff. at 6.  According to the plaintiff, "[t]he same comp agreement when I went over to General Motors was an agreement, that created banked time to be used same as cash."  *Id.* at 7.  Apparently, the plaintiff no longer received pay premiums for overtime; but he claims that there were no limitations on the use of comp time, as long as it did not interfere with his job.  The plaintiff says that all the plant trainers used comp time.  The plaintiff states that Graham Jackson was aware of this arrangement, and he previously had used it himself when he was a plant trainer.

The plaintiff acknowledges that while at Ford and for the beginning of his tenure at the General Motors plant, he was paid his wages by Cosworth, not General Motors or Raytheon.  He testified:

> Q.  And I guess it's true that much like when you were doing the Ford work, you continued to receive your paycheck from Cosworth after you transitioned?
> A.  That's correct.
> Q.  In other words, before that, you didn't get a Ford paycheck, you got a Cosworth paycheck?
> A.  That's correct.
> . . .
> Q.  But between January and February of 1997 when you said that you started the General Motors responsibilities, from that time period through whatever the time or date was when you transitioned to Gonzalez, you remained a Cosworth employee?
> A.  Correct.
> Q.  And then paid salary by Cosworth throughout that period of time, '97 through 2004?
> A.  My checks came from Cosworth, yes.

Def. Raytheon's Mot. Summ. J. Ex. 1, LaCourse Dep. at 99, 102-03.  However, the plaintiff states his paychecks were always the same amount because if he worked less than forty hours, he used comp time to make up the difference.

The plaintiff also testified that he kept and submitted weekly time sheets while under Cosworth's employ.  He says that the purpose of the time sheets was to record "[w]hat I did, where I was at, my hours had to be turned in every week, my vacation time, which they called no fault hours, sick time, because I got sick time and vacation time; they were very generous with that at Cosworth."  Def. Raytheon's Mot. Summ. J. Ex. 1, LaCourse Dep. at 165.  Defendant Jackson testified, however, that neither Cosworth nor Raytheon ever had time sheet forms:

> Q.  So you never saw any of his time sheets from Cosworth?
> A.  No.  And in fact, it should be on the record that the time sheets from Cosworth, if there are any, were created – a sole document created by Larry LaCourse that never existed from Cosworth.
> Q.  From Cosworth?

> A.  Cosworth never had a time sheet process.  Larry invented one on his own.
> . . .
> Q.  Raytheon had no time sheets for Larry; is that correct?
> A.  Raytheon's never had a time sheet for Larry.

Def. Raytheon's Mot. Summ. J. Ex. 2, Jackson Dep. at 28-29, 33.  At some point, the plaintiff claims

that he was instructed by a Raytheon employee to stop submitting time cards claiming comp time.

He stated in his affidavit:

> It was customary as set forth in my deposition to always turn in a time sheet to
> Cosworth, and a copy was left for Raytheon or General Motors, or Jackson, as
> provided.  Later on, Kathleen LaSalle, who was working at Raytheon, who was
> Jackson's boss, directed through her assistant to me, that she (Kathleen) or Jackson
> had to sign the time sheets that I was turning in.  And, then it was at that point that
> Kathleen LaSalle through her assistant, indicated to me not to show the comp time
> hours, and then after that not to show the banked hours, and then after that, not to
> show the B hours, because she knew Raytheon may be liable for the overtime.  So,
> I understood that she did not want them to be shown on the time slips.  She did not
> say  not to work those hours.  She did not say those would not be comp hours.  She
> just did not want the comp time to show up on the time slips because that would
> make Raytheon responsible for the comp time.

Pl.'s Resp. Ex. 1, LaCourse Aff. at 12.

In early 2004, Raytheon Professional Services had a dispute with Cosworth and decided to

stop contracting with that company and work with defendant Gonzalez instead.  The plaintiff

testified that Graham Jackson, on behalf of Raytheon, talked to him about working for Gonzalez:

> A.  Actually, it was all done through Graham Jackson.
> Q.  Well, what do you recall about what happened?
> A.  Well, he said, I'm trying to find you something as close to Cosworth benefits as
> possible.  He goes, I've already checked with this company, this company, this
> company, this company, he says, from what I can tell you, he said, it looks like
> Gonzalez will be your best choice.  He says, I know they're not going to be as good
> as – they're not going to have the benefits like Cosworth did, because I had great
> benefits there.  He says, but I'll make up the difference, he says whatever, because
> we want you to stay here, you made a big decision to stick with us here at plant
> training, me, and he goes Kathleen LaSalle and all the people above really want you
> to stay here, so we really appreciate it.  I'm going to make it right for you, we're

going to look out for you.  So you go ahead and go with Gonzalez, because he said
he felt that they were the best of what was out there at the time.

Def. Raytheon's Mot. Summ. J. Ex. 1, LaCourse Dep. at 181.  Graham Jackson, who works for

Raytheon, asked David Bonner, who works for Gonzalez, to hire the plaintiff.  Gonzalez offered the

plaintiff a weekly salary of $1,590, which works out to $82,680 per year, plus five weeks of paid

vacation, seven paid holidays, and health, dental, life, and disability insurance.  The offer was in

writing, and stated:

> January 9, 2004
>
> Larry LaCourse
> Drkaren@wowway.com
>
> Mr. LaCourse
>
> I would like to provide you with the following offer of employment.
>
> Customer:      Raytheon
> Location:      Troy Research Park
> Start Date:    January 12, 2004
>
> Salary:        $1,590.00 per week
>
> *Anticipated annual salary of $82,680.00 based on 52 weeks*
>
> Vacation:      5 weeks (built into salary)
>
> Holidays:      7 days (built into salary)
>
> Effective Dates:      Health Insurance:  February 1, 2004
>                       Dental Insurance:  February 1, 2004
>                       Life Insurance:  February 1, 2004
>                       Short Term Disability:  February 1, 2004
>
> Gonzalez Rep:      David Bonner
>
> Should you have any questions or need additional information, please contact me at
> your convenience.  I hope you find my offer acceptable, as I am excited to have you
> join the Gonzalez team.

Sincerely,
David L. Bonner

Def. Raytheon's Mot. Summ. J. Ex. 4, Offer.  The plaintiff expressed concern that his medical

benefits would cost him more after the switch to Gonzalez.  A second offer was made for $1,616 per

week, working out to $84,032 per year.  That offer reads:

January 26, 2004

Larry LaCourse
Drkaren@wowway.com

Mr. LaCourse

I would like to provide you with the following offer of employment.

Customer:       Raytheon
Location:       Troy Research Park
Start Date:     January 19, 2004

Salary:         $1,616.00 per week ($40.40 hour)

*Anticipated annual salary of $84,032.00 based on 52 weeks*

Vacation:       5 weeks (built into salary)

Holidays:       7 days (built into salary)

Effective Dates:        Health Insurance:  February 1, 2004
                        Dental Insurance:  February 1, 2004
                        Life Insurance:  February 1, 2004
                        Short Term Disability:  February 1, 2004
Gonzalez Rep:           David Bonner

Should you have any questions or need additional information, please contact me at
your convenience.  I hope you find my offer acceptable, as I am excited to have you
join the Gonzalez team.

Sincerely,
David L. Bonner

-7-

Def. Raytheon's Mot. Summ. J. Ex. 4, Offer.  The plaintiff accepted the job.  At his deposition, the following exchange took place:

> Q.  But you got this offer of $1,616 per week, correct?
> A.  1,616 at 40.40 an hour.
> Q.  Anticipated annual salary of 84,032 dollars?
> A.  Yes.  For 52 weeks.
> Q.  And vacation built in, five weeks, seven holidays, correct?
> A.  Seven holidays built in, yes.
> Q.  And then Gonzalez was also offering health insurance, dental insurance, life insurance and short-term disability?
> A.  Actually, long-term disability, too.
> Q.  Did you ultimately get all those benefits from Gonzalez?
> A.  Yes, I did.
> Q.  And you also got that salary from Gonzalez?
> A.  Yes.
> Q.  And was that the salary you received throughout your employment with Gonzalez?
> A.  I believe so.

Def. Raytheon's Mot. Summ. J. Ex. 1, LaCourse Dep. at 185-86.  In his affidavit, the plaintiff states, "I accepted Gonzalez/Jackson's offer because the Raytheon people had promised 'big plans for Larry' if I went to work for Raytheon/Jackson through Gonzalez.  Jackson assigned me to Gonzalez. I did not terminate my employment at Cosworth.  They did."  Pl.'s Resp. Ex. 1, LaCourse Aff. at 10.

When the plaintiff's employment with Cosworth ended, he claims that he had accrued vacation and comp time that he was owed.  He was paid for some unused vacation time; however, Cosworth never paid him for the comp time he had banked, and the plaintiff never attempted to receive this pay from Cosworth.

The plaintiff started working for Gonzalez in February 2004.  He was assigned to the same General Motors plant at which he previously worked for Cosworth.  The plaintiff claims he was an hourly worker, primarily because the second offer-letter recited a labor rate of $40.40 per hour after the stated weekly salary of $1,616.  However, David Bonner testified at his deposition that the

-8-

plaintiff was a salaried employee, even though there may have been weekly time cards.  Bonner

explained:

> Q.  At the same time you knew that Larry LaCourse was putting in more hours than
> 40 hours on many occasions or on some occasions; is that fair?
> A.  It was my impression that Larry was putting in more than 40 hours on some weeks.
> Q.  Okay.
> A.  And less than 40 hours on some weeks.
> Q.  But in either situation, he was paid for 40 hours?
> A.  Correct, and possibly 0 hours on some weeks.
> Q.  If there was 0 hours on some weeks, he wouldn't get paid?
> A.  I would have a time card, but he may not have worked that week because built
> into his salary was five weeks of vacation. . . .
> . . .
> Q.  So in relationship to the extra hours, how was he going to get paid for those
> hours?
> A.  He wasn't going to be paid for any extra hours.  When I signed him up, he was
> a salaried employee.
> . . .
> Q.  You didn't tell him he couldn't work more than 40 hours a week, did you?
> A.  Oh, no.  He wanted to work 60, 70, he's on salary.  Whatever it takes to get the
> job done. . . .  I was hiring Larry as a salaried employee.

Def. Raytheon's Mot. Summ. J. Ex. 3, Bonner Dep. at 16-18, 21-22.

The plaintiff claims the comp time arrangement continued after he moved to Gonzalez.  He

appears to believe that the comp time hours he claims were owed to him by Cosworth also were

transferred to Gonzalez.  The plaintiff testified as follows at his deposition:

> Q.  Now, during the time that you're accepting employment Gonzalez, did you ever
> try and work out an arrangement with Mr. Bonner similar to what you apparently had
> with Cosworth where you could bank time?
> A.  Did I try and work it out?
> Q.  Yes.  Did you have any discussions with him about banking comp time?
> A.  Yes.
> Q.  With Mr. Bonner?
> A.  Bank time?
> Q.  Yes.
> A.  Yeah, kind of.
> . . .

A.  When David Bonner gave me the – I remember everything in detail about it.  He gave me these little sheets to fill out, they were handwritten, little triplicates or four pages or something, and I was supposed to keep the pink or the orange copy.  You had to fill these out every week, you can put 40 hours per week down here only.  I said David, I work sometimes 70, 75 hours a week, he said you can only put down 40 hours per week.  I says well, why is that?  Sometimes I work 70 to 80 hours.  He said whatever arrangements you have had with Graham Jackson in the past, just continue that.  So I said okay.

Q.  Did you have any discussion with the banked time that you had at Cosworth that apparently you hadn't used?

A.  No.

Q.  Did you ever try and sit down with anybody at Gonzalez and suggest that they ought to assume whatever liability or responsibility for that banked time that you didn't get paid for when you terminated with Cosworth?

A.  Well, I kind of figured that heck, they assumed the five weeks vacations, what company would give you five weeks vacation as a new hire, so they absorbed that, so I figured they would absorb whatever –

Q.  But you never had any discussions about what was going to happen with that prior comp time?

A.  The reason I didn't is because he said continue with what you're doing with Graham Jackson now, just continue that.

. . .

Q.  Now, if you never told Gonzalez that you had all these hours from Cosworth, how was Gonzalez supposed to know that if they employ you, they were going to be responsible for some six or seven hundred or whatever hours you claim that you had banked at Cosworth?

A.  I would assume my manager, my Raytheon manager, Graham Jackson, who controlled my activities, would convey that to David along with the fact that he was going to give me five weeks vacation, tell him how much he's going to pay me per year or per hour.

Def. Raytheon's Mot. Summ. J. Ex. 1, LaCourse Dep. at 189-91, 214.  Mr. Bonner denies telling the

plaintiff that any arrangement he previously had with Mr. Jackson would continue.  Bonner testified:

Q.  You had a conversation with Larry LaCourse and he discussed extra hours or extra time or comp time that he had in relationship to more than 40 hours a week and you indicated to him whatever you have going with Graham Jackson in this area, that's my term, you can continue to do that, but we're not going to pay you any more than 40 hours a week; is that a yes or no, if you can answer that?

A.  I don't' believe we had a conversation that was stated in that manner.

Q.  Did you have a conversation similar to that and if so, what was it?

A.  I believe we had a conversation that things will stay the same, that you're going to be doing the same job.  I am going to be paying you a salary.  I understand that

-10-

you won't be working 40 hours every week and I understand that you might be working more than 40 hours.

Def. Raytheon's Mot. Summ. J. Ex. 3, Bonner Dep. at 20.

Defendant Jackson had a different understanding of the comp time arrangement. According to Jackson, he would agree to let the plaintiff take a day off here and there if the plaintiff had worked especially long hours the previous few weeks, but the policy was informal and random. Jackson explained:

> Q. Did Larry LaCourse have comp time when he was doing this type of work?
> A. Yes.
> Q. Okay. Can you tell me what that comp time consisted of, from the years 19 – I think you said that you were familiar with him from 1997 to 2004, what did that comp time consist of?
> A. From 1997 to 2000 I had no dealings with it and couldn't tell you anything about how any of that was administered or taken care of.
> Q. Okay.
> A. On Larry's individual case. I wouldn't know. From 2000 to 2004, if Larry was required to travel exorbitantly by the plant's needs, we would afford Larry, we would afford Larry time off during the week to make up for that extra effort that he put out.
> Q. . . . so the comp time is only in relationship to extra time that was travel and then you can take it off at some other time for personal time, is that what you're saying?
> A. That's correct.
> Q. So I can do a mathematical one in my head, if you get five hours of comp time, you can use five hours of personal time at some other time; is that correct?
> A. No, there's no specifics on that. It's very ambiguous. It's based on my individual conversation with that person. There's no specific guidelines. I have no specific number. If that person comes to me and says General Motors requires me to be at the plant the last five Sundays in a row, do you think I could take – not come in the office, for example, this Friday because I've really been stretched these last four Sundays I had to travel? And I would say yes in most cases.
> Q. So you were the arbiter of what someone could do with their comp time; is that correct?
> A. Again, I would afford them time away from the office of time off, but based on what they had done above and beyond, but nothing – there's no direct link to the number of hours or anything because again, I don't track their – again, we talked about it. I don't track them.
> Q. Let me see if I can get it clear. You're telling me you don't track their hours when they're working, is that what you're saying?
> A. Yes.

-11-

Q.  Okay.  So since you don't track their hours, you still make the determination on what comp time they can use, is that what you're saying? . . .

A.  Where I'm going with this is that General Motors is looking for a certain service. If they don't see Larry, for example, on hand providing that service they're going to come back to me and say why aren't we getting this service today?  And so from that point of view, I had to, I have to communicate with Larry to say Larry – Larry would tell me I have traveled for the last six Sundays in a row, for example.  I would like to not be present this Friday.  Is that okay with you?  And if it met the mark and I believed what he had told me, that he had worked the lasted [sic] six Sundays in a row, then in most cases, yes.  I would say that's fine.  I'll answer to General Motors if they are looking for you.

Q.  But you're real clear that it's not if you worked five extra hours, you get five hours off; right?

A.  Absolutely.  There's no correlation, none whatsoever.

. . .

Q.  Is this comp time scenario, for lack of a better term, written down anyplace?

A.  No.

Q.  It's not written down, but the people that I mentioned, including Larry LaCourse, all know about it; am I right?

A.  They're aware of the policy.

Q.  Okay, and I don't want to miss – I don't want to mess up exactly what it is.  So can you tell me to the best of your knowledge exactly what the policy is?

A.  It's nothing formal.  It's strictly verbal and it's that if you can communicate your situation for the amount of work or exorbitant travel that you've had to do on behalf of General Motors, that we will consider that or that I would consider that and there's a possibility that you may not have to show up another time.

Q.  Could people use this for sick time?

A.  No.

Def. Raytheon's Mot. Summ. J. Ex. 2, Jackson Dep. at 41-44, 46.

Mr. Bonner testified that there was no comp time arrangement at all as far as he was concerned.  He said that he "understood that there may be times Monday through Friday that [the plaintiff] may not be working.  I wouldn't agree to the word comp time."  Def. Raytheon's Mot. Summ. J. Ex. 3, Bonner Dep. at 21.  His description of the arrangement was roughly similar to Jackson's understanding of the arrangement.  Bonner said:

My expectations, if that's how he would be working is based on I had other people there.  I knew how many hours approximately they would work.  I knew there were plenty of times that hey, you know, I got slammed at the plant and I'm taking

-12-

> Monday off and I did not find that unusual.  If I had to go back to my office tonight and do a quote and work on it until 2:30 in the morning, if I don't have anything going on tomorrow, I might not be at the office, but I may have to be at the office if there is something going on and I would expect Larry to do that and expect that that's what he was doing in the past.

*Id.* at 21-22.

The plaintiff testified that he had to complete time cards in order to get paid while at Gonzalez.  He said that he prepared the time sheets in advance – sometimes months in advance of the pay periods – and recorded forty hours per week regardless of the time he actually worked.  The plaintiff testified that David Bonner instructed him to do this.  When the plaintiff protested that he sometimes worked more than forty hours, he said Bonner responded by telling him "whatever arrangement I had for overtime or comp hours with Graham Jackson, just to continue that.  And I go okay.  And Graham knew of it, Danielle knew of it, my administrative assistant, everyone there works more than 40 hours a week and everyone does the same thing."  Def. Raytheon's Mot. Summ. J. Ex. 1, LaCourse Dep. at 242.

Mr. Bonner acknowledged that time cards were used to verify that the plaintiff was working as required by General Motors and to show to the bank auditor who approves loans.  Bonner testified that the amount of the plaintiff's weekly pay did not vary.  He admitted that sometimes the plaintiff worked more than forty hours and sometimes he worked less; but either way, Bonner testified, the plaintiff was paid the same amount.  Bonner said he directed the plaintiff to put 40 hours on the time cards regardless of how many hours he worked, since the time cards were not used to determine the plaintiff's pay.

As a plant training consultant, the plaintiff researched, developed, and presented course material to the auto assembly plant repair technicians.  When the plaintiff transferred to the General

-13-

Motors site, he found a document titled, "STG Plant Training Consultant Overview" in the desk he was assigned.  He agreed that the document accurately portrayed his job duties.  The document read:

> 1.  Work with each assigned plant contact person to develop their short and long term training needs.
> 2.  Work with the Employee Development representative to develop employee training tracking system.
> 3.  Research and modify existing training materials to meet individual plant needs.
> 4.  Identity future product training needs and develop new training material in coordination with product and powertrain engineers.
> 5.  Use word processor software and other on-site resources to develop and produce training materials.
> 6.  Spend approximately one half of total work time at assigned plant locations facilitating training by one or more of the following methods:
>> a)  Directly train the trainer or individuals as required.
>> b)  Assist the plant in securing outside contract instructors if required.
>> c)  Assist plant in scheduling technicians into local training centers or affiliated colleges if required.
> 7.  Assist plant repair area with difficult-to-diagnose problems when possible.
> 8.  Provide management with contact reports for each plant contact and progress reports as required.

Def. Raytheon's Mot. Summ. J. Ex. 5, STG Overview.  He acknowledged that he created training materials.  He testified that he "would exercise [his] discretion to research and otherwise modify as necessary whatever training materials existed in order to respond to individual plant needs."  Def. Raytheon's Mot. Summ. J. Ex. 1, LaCourse Dep. at 139.  Those tasks comprised about twenty-five percent of the plaintiff's job.  He spent about thirty to forty percent of his time at the plant.  Some of the work required physical exertion.  But defendant Jackson explained that the plaintiff was not permitted to use tools to repair cars; he was only permitted to use tools to show the General Motors union workers how to repair cars.

Graham Jackson was the plant training supervisor for Raytheon.  The plaintiff testified that his training plans had to be approved by Jackson, and Jackson acknowledged that he designated the

-14-

plaintiff's plant assignments. However, the plaintiff signed an acknowledgment that he was not an

employee of Raytheon. The acknowledgment reads:

> I, Lawrence K. LaCourse acknowledge that I am a Gonzalez Contract Services employee. I realize that although I may be assigned to provide services at a customer facility, total responsibility for my benefits, pay, insurance, and all other aspects of the employee/employer relationship is maintained with Gonzalez Contract Services.
>
> I further acknowledge that the customer (Raytheon) utilizing my services as a Gonzalez Contract Services employee, is not my employer and that my services may be terminated at any time.

Def. Gonzalez's Mot. Summ. J. Ex. 4, Employee Acknowledgment. The employment application,

which the plaintiff signed, further states,

> I agree that any action or suit against the employer arising out of my employment or termination of employment including, but not limited to, claims arising under State or Federal Civil Rights Statutes, must be brought within 180 days of the event giving rise to the claims or be forever barred. I waive any limitations period to the contrary.

*Ibid*.

The plaintiff worked for Gonzalez for about three months. In late April, Raytheon contacted

Mr. Bonner and told him that the plaintiff's services were no longer needed. Mr. Bonner tried to

find another plant for the plaintiff but was unable to do so, and the plaintiff was laid off. Mr. Bonner

asked the plaintiff what happened to cause Raytheon to request his removal. Mr. Bonner testified

that the plaintiff admitted he sent inappropriate emails. Regarding his termination, the plaintiff's

affidavit states as follows:

> Gonzalez did not fire me, Raytheon did. The official stated reason for me leaving my employment was laid off, lack of work. Raytheon told me to leave. Raytheon had work for me. The lack of work excuse given to me was untrue. Raytheon advertised for my position immediately after I left.

Pl.'s Resp. Ex. 1, LaCourse Aff. at 13.

The plaintiff filed the present lawsuit on August 26, 2005.  His complaint pleads five counts. Count one is labeled "Federal Fair Labor Standards Claim" and alleges that the defendants wilfully violated sections six and seven of the FLSA, 29 U.S.C. §§ 206, 207.  Count two is labeled "Violations of the Fair Labor Standards Act Incorporated in the Policies and Procedures of Defendants."  It alleges that the defendants incorporated the provisions of the FLSA into their policies and procedures and thus violated those policies by failing to comply with the Act, entitling the plaintiff to compensation under the Act.  This count also alleges that the defendants acted wilfully.  Count three alleges a violation of the First Amendment.  Count four, labeled "Fraud/Duress," alleges that defendants Gonzalez and Raytheon had policies prohibiting falsification of records, yet the plaintiff was required to falsify his time records.  The plaintiff claims he "had the understanding" that he would be disciplined if he refused, and he therefore complied under duress.  This count states that "Defendants Gonzalez and Raytheon hence fraudulently represented to the Plaintiff their policies, to which Plaintiff suffered damages of lost compensation." Compl. ¶ 52.  Count five is labeled "Breach of Contract – Gonzalez and Raytheon," and it alleges that Gonzalez's and Raytheon's employee handbooks created "an implied contract of compensation" and that the plaintiff had a "legitimate expectation" that he would be paid overtime at a rate of time-and-a-half.  The plaintiff contends that the failure of Gonzalez and Raytheon to compensate the plaintiff in accordance with these procedures violated the contract and the legitimate expectations.

The defendants move for summary judgment as to all these counts.

## II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial.  The Court must view the evidence and draw all

-16-

reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148   (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Thus a factual dispute that "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment that is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the

-17-

absence of a genuine dispute over material facts.  *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).  The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper.  *Celotex Corp.*, 477 U.S. at 322-23.

Although "[i]n evaluating the evidence, [the district court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party,'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003), the party who bears the burden of proof must present a jury question as to each element of the claim.  *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000).  Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

A.

Section 207 of the Fair Labor Standards Act requires that employers pay their covered employees one and one-half times their "regular rate" of pay for all hours worked in excess of forty hours in a workweek:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). This requirement was designed to encourage employers to hire additional employees, reducing unemployment. *Brooks v. Vill. of Ridgefield Park*, 185 F.3d 130, 133 (3d Cir. 1999) ("Congress believed that requiring employers to pay an overtime premium whenever an employee worked over forty hours in a work week would encourage employers to hire additional workers rather than pay the overtime penalty.").

Defendants Raytheon and Jackson contend that the plaintiff is not protected by section 207 because (1) they are not "employers" within the meaning of the Act, and (2) LaCourse is not a covered employee because he is exempt from the Act under section 213(a)(1), 29 U.S.C. § 213(a)(1), and the regulations that interpret that section.

1.

The FLSA applies only to those engaged in an employment relationship. The Act helpfully defines an employee as "any individual employed by an employer." 29 U.S.C. § 203(e). To "employ" means "to suffer or permit to work." 29 U.S.C. § 203(g). The Act defines "employer" as those "acting directly or indirectly in the interest of an employer in relation to an employee." 29

-19-

U.S.C. § 203(d).  In *Goldberg v. Whitaker House Cooperative, Inc*., 366 U.S. 28, 33 (1961), the

Supreme Court explained that it is the "economic reality" of the relationship that determines whether

a worker is an employee of another person or entity within the meaning of the FLSA.

> The Sixth Circuit has explained that this inquiry is fact-specific:
>
> [E]conomic dependence may be the ultimate controlling factor in a given situation for finding an employment relationship.  Another panel of this court has emphasized that in examining a particular factual setting the total relationship must be examined, rather than isolated factors.  *Dunlop v. Dr. Pepper-Pepsi Bottling Co.*, 529 F.2d 298 (6th Cir. 1976.  The issue of the employment relationship does not lend itself to a precise test, but is to be determined on a case-by-case basis upon the circumstances of the whole business activity.

*Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984).  In *Brandel*, the Sixth Circuit looked at

six factors to determine whether an employer-employee relationship existed:  (1) the permanency

of the relationship between the parties; (2) the degree of skill required for the rendering of the

services; (3) the worker's investment in equipment or materials for the task; (4) the worker's

opportunity for profit or loss, depending upon his skill; (5) the degree of the alleged employer's right

to control the manner in which the work is performed; and (6) whether the service rendered is an

integral part of the alleged employer's business.  *Brandel*, 736 F.2d at 1117.

> Under Department of Labor regulations, more than one entity or individual may be an

employer of a person within the meaning of the FLSA.

> (b) Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:
> (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or
> (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
> (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the

-20-

employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2(b) (2004).

Individuals can also be considered employers under the Act. In *United States Department of Labor v. Cole Enterprises, Inc.*, 62 F.3d 775, 778 (6th Cir. 1995), the defendants were a company that owned a restaurant and the company's president, who owned fifty percent of the company's stock. The Sixth Circuit held that the president was a co-employer for purposes of the FMLA where the individual "was engaged in running the business, . . . he was authorized to issue checks on the corporate accounts, . . . he and his wife had custody and control of the employment records, and were responsible for maintaining those records[,] . . . [and he and] his wife determined the employment practices for the Echo Restaurant, including hiring, firing, rates of pay and hours of work." *Id*. at 778 (internal citations omitted).

The Sixth Circuit has recognized that "'[u]nless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract.'" *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 315 (6th Cir. 1998) (quoting Restatement (Second) of Agency § 320), as cited in *Riddle v. Lacey & Jones*, 135 Mich. App. 241, 351 N.W.2d 916, 919 (1984); *see also Soberay Mach. & Equip. Co. v. MRF Ltd., Inc.*, 181 F.3d 759, 767-68 (6th Cir. 1999) (applying Ohio law and holding "that '[a]n agent who acts for a disclosed principal and who acts within the scope of his authority and in the name of the principal is ordinarily not liable on the contracts he makes' because the third party intended to deal with the principal, not the agent"); *Summit Petroleum Corp. of Indiana v. Ingersoll-Rand Fin. Corp.*, 909 F.2d 862, 868 (6th Cir. 1990) (same, applying Kentucky law). Likewise, under Title VII of the Civil Rights Act of 1964, "an individual employee/supervisor, who does not otherwise qualify as an 'employer,' may

-21-

not be held personally liable under Title VII." *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997); *see also Burlington Indus. v. Ellerth*, 524 U.S. 742, 754 (1998) (observing that "Congress has directed federal courts to interpret Title VII based on agency principles").

However, Section 203(d) of the Fair Labor Standards Act as codified in Title 29 broadly defines "employer" to mean "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Supreme Court has held that the term is to be construed expansively to fulfill the remedial goals of the Act, and therefore the FLSA contemplates that more than one employer may be responsible for violations under the Act. *See Falk v. Brennan*, 414 U.S. 190, 195 (1973). Likewise, the Sixth Circuit has held that "[t]he remedial purposes of the FLSA require courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications." *Dole v. Elliott Travel & Tours*, 942 F.2d 962, 965 (6th Cir. 1991) (internal quotes and citations omitted).

In *Dole*, the court set forth an "economic realities" test to determine whether a supervisor may be considered an "employer" under the FLSA. *Id.* at 965 (holding that "in deciding whether a party is an employer, economic reality controls rather than common law concepts of agency"). The main focus of the inquiry is whether the supervisor exercises "substantial control of the terms and conditions of the work of [the] employee." *Falk*, 414 U.S. at 195.

The Court finds that there are facts in dispute that prevent a determination as a matter of law the Raytheon was not LaCourse's employer. As noted above, the factors to consider are economic dependence, permanency of the relationship, the degree of skill used by the employee, the worker's investment in material, the worker's opportunity for profit or loss, the degree of control exerted by alleged employer, and whether service provided is integral to employer's business. *Donovan*, 736

-22-

F.2d at 1116-17.  Although four of these factors tend to show that there is no employment relationship between Raytheon and the plaintiff, the other three tend to show there is.  The plaintiff was not economically dependent on Raytheon.  He received his paycheck from Gonzalez, and apparently at some point General Motors had contracted directly with Gonzalez rather than going through Raytheon.  The plaintiff appears to utilize a good degree of skill in his job.  Further, the plaintiff's position as a trainer is not integral to Raytheon's business.  However, the plaintiff did not invest in equipment or have opportunity for profit or loss, and he has alleged that Raytheon had a great deal of control over how he did his job.  These factors are in favor of finding an employment relationship.

However, the undisputed facts favor summary judgment for defendant Jackson.  Although individuals can be employers under the Act, this only happens where such an individual "has operational control and qualifies as an 'employer' for the purposes of FLSA." *Cole*, 62 F.3d at 778. The plaintiff has presented no evidence that Mr. Jackson qualifies as such a person.  The plaintiff claims in his deposition that Mr. Jackson approved his training plans in advance and directed his daily activities, but he did not testify that Mr. Jackson has any ownership or operational control over Raytheon, Gonzalez, or the General Motors facility where the plaintiff worked.  The plaintiff did testify that Jackson helped him get the job with Gonzalez, encouraged him to take it, and helped negotiate his salary from Gonzalez.  However, the plaintiff testified that he received his salary from Gonzalez.  In *Finke v. Kirtland Community College*, this Court found a college administrator to be an employer under the Act.  However, in that case, the administrator was alleged to be the "*de facto* president of the college, [who] hired Finke, supervised his work, set his wages, prescribed the conditions of his employment, authorized him to work on special projects off site, and approved his

-23-

time sheets." *Finke v. Kirtland Cmty Coll. Bd. of Tr.*, 359 F. Supp. 2d 593, 599 (E.D. Mich. 2005).
The plaintiff in *Finke* made allegations that allowed a determination that the individual defendant
controlled the operation of the college. The plaintiff in this case has failed to come forward with
any such proof as to Graham Jackson. He has made allegations only that Mr. Jackson has control
over his work individually. He has failed to make any allegations that Mr. Jackson had operational
control over Gonzalez, Raytheon, or General Motors. Mr. Jackson is not an employer and will be
dismissed from the case.

There is no question that Gonzalez was the plaintiff's employer from February 2004 through
late April or early May of that year. Gonzalez does not argue otherwise.

2.

All defendants contend that the plaintiff was an exempt employee, however. In refuting that
argument, the plaintiff relies in his brief upon Department of Labor regulations that went into effect
in August 2004, well after his employment with Gonzalez ended. Under those "new" rules, an
employee must make at least $455 per week ($23,660 per year) to be considered exempt.
Employees who make more than $23,660 per year but less than $100,000 are subject to the "standard
duties" test. Employees who make over $100,000 per year are subject to the "highly-compensated"
duties test. The long and short tests applicable under the pre-August 23, 2004 regulations are no
longer applied. The new regulations "do not apply to manual laborers or other 'blue collar' workers
who perform work involving repetitive operations with their hands, physical skill and energy." 29
C.F.R. § 541.3(a).

The defendants insist that these new regulations are not applicable to the present dispute, and
at oral argument on the motions the plaintiff acknowledged that the case must be decided under the

-24-

regulations in effect during his employment.   The Court believes that cases decided after the amendment date must apply the prior regulations if the claim arose before the new regulations took effect.  *See, e.g. Gruener v. Ohio Cas. Co.*, 416 F. Supp. 2d 592, 604-05 (S.D. Ohio 2005) (applying pre-August 23, 2004 regulations).

The governing statute exempts from the FLSA's premium wage requirement certain "white collar" workers:   executive, administrative, and professional employees.   At the time of the plaintiff's employment, the exemption provision read as follows:

> (a) Minimum wage and maximum hour requirements.
> The provisions of section 206 (except subsection (d) in the case of paragraph (1) of this subsection) and section 207 of this title shall not apply with respect to –
> (1) any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman.

29 U.S.C. § 213(a)(1).

The regulations implementing this section further provided:

> The term employee *employed in a bona fide * * * administrative * * * capacity* in section 13(a)(1) of the Act shall mean any employee:
> (a) Whose primary duty consists of . . . [t]he performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customer . . . and
> (b) Who customarily and regularly exercises discretion and independent judgment; and
> (c)(1) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined in the regulations of this subpart), or
> (2) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge, or
> (3) Who executes under only general supervision special assignments and tasks; and
> (d) Who does not devote more than 20 percent . . . of his hours worked in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (c) of this section; and
> (e)(1) Who is compensated for his services on a salary or fee basis at a rate of not less than $155 per week . . . exclusive of board, lodging, or other facilities . . .

-25-

> *Provided*, That an employee who is compensated on a salary or fee basis at a rate of not less than $250 per week . . . exclusive of board, lodging, or other facilities, and whose primary duty consists of the performance of work described in paragraph (a) of this section, which includes work requiring the exercise of discretion and independent judgment, shall be deemed to meet all the requirements of this section.

29 C.F.R. § 541.2 (2004).  Section 541.214, a "special proviso for high salaried administrative employees," provides further information about employees who are paid over $250 per week:

> (a) Except as otherwise noted in paragraph (b) of this section, § 541.2 contains a special proviso including within the definition of "administrative" an employee who is compensated on a salary or fee basis at a rate of not less than $250 per week exclusive of board, lodging, or other facilities, and whose primary duty consists of either the performance of office or nonmanual work directly related to management policies or general business operations of the employer or the employer's customers . . . where the performance of such primary duty includes work requiring the exercise of discretion and independent judgment.  Such a highly paid employee having such work as his or her primary duty is deemed to meet all the requirements in § 541.2 (a) through (e).  If an employee qualifies for exemption under this proviso, it is not necessary to test the employee's qualifications in detail under § 541.2 (a) through (e).

29 C.F.R. § 541.214.  These regulations create a "long test," applying to employees making between $155 and $249 per week, and a "short test," applying to employees who make at least $250 per week.  *See Ale v. Tennessee Valley Auth.*, 269 F.3d 680, 683 (6th Cir. 2001).  The employer bears the burden of proving that the exemption applies.  *Renfro v. Indiana Michigan Power Co.*, 370 F.3d 512, 515 (6th Cir. 2004).

An employee can use "discretion and independent judgment" even if his decisions are reviewed by a supervisor or manager.  29 C.F.R. § 541.207(e)(1) (2004) (stating that an employee may exercise discretion despite the absence of "finality that goes with unlimited authority and a complete absence of review," and even when "the decisions are revised or reversed after review").

As noted above, an employee's work must be "directly related to management policies or general business operations of the employer or the employer's customers" before he can be

considered administrative. The regulations specifically recognize that sometimes a company contracts its employees out to work at another company's facility. Such employees may qualify as exempt administrative employees by doing work related to the general business operations of the company at which they are assigned. 29 C.F.R. § 541.205(d) (2004) (noting that "many bona fide administrative employees perform important functions as advisers and consultants but are employed by a concern engaged in furnishing such services for a fee. . . . Such employees, if they meet the other requirements of § 541.2, qualify for exemption regardless of whether the management policies or general business operations to which their work is directly related are those of their employer's clients or customers or those of their employer").

The defendants contend that the plaintiff fits within the description of an administrative worker under the "short test" set out in the regulations. They say that the plaintiff earned a salary that was well above the $250-per-week minimum, his work in devising repair and production systems was primarily non-manual, and the manner in which he devised the training protocols required the exercise of discretion and independent judgment. The plaintiff disputes each of these elements. He argues that he was paid by the hour rather than a salary, he worked primarily on the plant floor performing manual tasks, and his work was closely supervised rather than independent.

Both parties cite the case of *Renfro v. Indiana Michigan Power Co.*, which, the Court believes, provides the controlling authority for adjudicating the present motions. In that case, the plaintiffs sued a power company (AEP) for overtime wages and the defendant contended that the employees were exempt. The employees worked as "planners," whose jobs entailed the identification of maintenance or new construction tasks and preparing work packages for execution in the field. The job required some field work in order to analyze the job needs, determine the

-27-

procedures that should be used, and obtain the necessary permits.  The plaintiffs were required to account for their time during the day and make up missed days, but their pay was never reduced for missing work.  The court of appeals held that the employees were exempt under the "short test," which the court summarized as follows:

> AEP must demonstrate (1) that it pays the planners at least $250 per week on a salary or fee basis; (2) that the planners' primary duty consists of office or nonmanual work directly related to AEP's management policies or general business operations; and (3) that the planners' primary duty requires them to exercise discretion and independent judgment.

*Renfro*, 370 F.3d at 516.

The court first concluded that the plaintiffs were salaried workers even though they were required to account for their time and make up partial day absences, because their pay was never reduced for missing work.  The court then rejected the employees' argument that performance of manual work in the field precluded the finding that they were white collar workers.  "Performing some manual work does not automatically remove an employee from exempt status so long as the manual work is 'directly and closely related to the work requiring the exercise of discretion and independent judgment'. . .  [T]he field walk-downs – performed as part of the planners' preparation of work repair packages – are 'directly and closely related to the [planners'] work requiring the exercise of discretion and independent judgment,' supporting exemption from the FLSA." *Id.* at 517 (citing 29 C.F.R. § 541.203(b)).  The court next determined that the plaintiffs serviced the business by doing work that was directly related to the employer's general business operations.  The court reasoned:

> Under the administrative/production dichotomy analysis, the job of "production" employees "is to generate (i.e. 'produce') the very product or service that the employer's business offers to the public."  *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 9 (1st Cir. 1997).  When employees engage in work that is "ancillary to an

-28-

employer's principal production activity," those employees are administrative. *Martin v. Cooper Elec. Supp. Co.*, 940 F.2d 896, 904 (3d Cir. 1991). This analysis, however, "is only useful to the extent that it is a helpful analogy in the case at hand." *Schaefer*, 358 F.3d at 402-03. AEP's principal production activity is generating electricity, and the product it offers the public is electricity; the planners' primary duty – creating plans for maintaining equipment and systems in the nuclear plant – is ancillary to AEP's principal production activity of generating electricity. While not precisely "administrative," the planners' duties form the type of "servicing" ("advising the management, planning," etc.) that the FLSA deems administrative work directly related to AEP's general business operations.

*Id.* at 517-18. The court further concluded that the plaintiffs' work was of substantial importance to the employer, finding that "[t]heir work – interpreting and carrying out plant policies, creating plans that permit the continued operation of the equipment and systems that generate AEP's main product – affects AEP's general business operations to a substantial degree." *Id.* at 518. Finally, the court found that the job required the plaintiffs to exercise discretion and independent judgment. The court viewed the plaintiffs' primary duty as solving problems. The court explained:

> The process of generating repair work packages is neither wholly mechanical nor restricted to "merely appl[ying] knowledge in following prescribed procedures." 29 C.F.R. § 541.207(c)(1). When there is no procedure that can be applied to a particular task, the planners independently determine the nature of the repair task and prepare a repair plan. In those situations, planners use their own skill, experience, judgment, and discretion in formulating a repair solution. Additionally, the planners exercise independent decisionmaking when choosing among various options to remedy a problem-for example, determining whether to replace or repair equipment. The deposition evidence demonstrates that the planners make such independent decisions and exercise judgment on a daily basis.

*Id.* at 519.

In this case, the Court finds that there are no material fact disputes as to the plaintiff's job duties and the manner of his payment. Rather, the legal consequences that flow from those facts form the main contest in this case. Because the plaintiff earned more than $250 per week, the short

test applies.  The first element of that test requires that the plaintiff's wage be paid on a salary or fee basis.  For defendants Jackson and Raytheon, the Court finds that the first element of the test is satisfied.  For reasons explained below, Gonzalez has not met its burden on that element.

The plaintiff testified that he was offered the position with Gonzalez at $1616 per week, plus five weeks of vacation and medical benefits, which he accepted.  The plaintiff admitted this is what he was paid in fact.  Def. Raytheon's Mot. Summ. J. Ex. 1, LaCourse Dep. at 185-86 ("Q.  Did you ultimately get all those benefits from Gonzalez?  A.  Yes, I did.  Q.  And you also got that salary from Gonzalez?  A.  Yes.  Q.  And was that the salary you received throughout your employment with Gonzalez?  A.  I believe so.").  An employee is salaried if he "regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed."  29 C.F.R. § 541.118(a).  The plaintiff has presented no evidence that his weekly salary of $1616 was ever reduced based on the quality or quantity of his work and in fact admitted that he did receive that salary through his employment.  "It is only when an employer actually deducts from an employee's paycheck that the employee is ineligible for the exemption."  *Renfro*, 370 F.3d at 516.  The plaintiff, therefore, was paid on a salary basis.

The second element of the short test has been satisfied as well.  The plaintiff acknowledged that his job was mostly office or non-manual work directly related to the general business operations of General Motors.  Def. Raytheon's Mot. Summ. J. Ex. 1, LaCourse Dep. at 34 ("[M]y main function was to train people in the final repair areas at automotive assembly plants, . . . to give them technical training and assist them in their jobs.").  The plaintiff insists that he spent a good part of his time on the plant floor trying to devise repair solutions.  However, he agreed that the description

-30-

of his position in the STG Plant Training Consultant Overview accurately set forth his work duties, and that document put him in the plaint training others "approximately one half of total work time." Def. Raytheon's Mot. Summ. J. Ex. 5, STG Overview.  Working as a hands-on expert to figure out how to do certain repairs does not make the plaintiff a manual worker.  "Performing some manual work does not automatically remove an employee from exempt status so long as the manual work is 'directly and closely related to the work requiring the exercise of discretion and independent judgment.'"  *Renfro*, 370 F.3d at 516 (quoting 29 C.F.R. § 541.203(b)).

Moreover, the plaintiff's work was directly related to the management policies or general business operations of General Motors, just as the planners' work in *Renfro* with respect to AEP.  The plaintiff was not engaged in producing motor vehicles; rather, he taught the production employees how to conduct certain repairs so the assembly line could proceed.  The plaintiff was a consultant, not a production worker.  "When employees engage in work that is 'ancillary to an employer's principal production activity,' those employees are administrative."  *Renfro*, 370 F.3d at 517 (*quoting Martin v. Cooper Elec. Supp. Co.*, 940 F.2d 896, 904 (3d Cir. 1991).

Finally, when the plaintiff did use a hands-on approach to figure out how to repair something, he was exercising discretion and independent judgment.  The plaintiff's affidavit states, "I and the others would use the tools and take the part apart . . . so that we would know how to take those apart and teach other people how to take these apart and put them back together, and how to make certain repairs on them."  Pl.'s Resp. Ex. 1, LaCourse Aff. at 2-3.  The plaintiff admitted he exercised his discretionary judgment, and General Motors relied on his expertise.  He was asked at his deposition, "So you would exercise your discretion to research and otherwise modify as necessary whatever training materials existed in order to respond to individual plant needs?"  He

-31-

replied, "Correct."  Def. Raytheon's Mot. Summ. J. Ex. 1, LaCourse Dep. at 139.  Further, he was

asked,

> Q.  I guess what I'm trying to understand is, however the plant contact people were
> at these various General Motors plants, I assume they relied upon your expertise in
> order to address their short and long-term training?
> A.  Right, it was mutual.
> . . .
> Q.  I understand.  But you were the expert making the recommendations and you
> would present those recommendations to the General Motors person to either accept
> or not; is that fair?
> A.  Sure.  I would put together the package and he could say let's change this or let's
> add this.  But all of our contacts which we had to provide Graham Jackson a contact
> list and keep it maintained, that was the person that we dealt with, to make those
> decisions.

Def. Raytheon's Mot. Summ. J. Ex. 1, LaCourse Dep. at 119-20.  The plaintiff used his "own skill,

experience, judgment, and discretion in formulating a repair solution."  *Renfro*, 370 F.3d at 519.  The

fact that Mr. Jackson provided some supervision of his work does not mean that the plaintiff did not

use discretion.  The regulations do not require "that the decisions made by the employee must have

a finality that goes with unlimited authority and a complete absence of review."  29 C.F.R. §

541.207(e)(1) (2004).

As to defendants Raytheon and Jackson, the Court finds that the plaintiff was an exempt

administrative employee under the FLSA and the regulations that were in effect at the time of his

employment.  Therefore, counts one and two of the complaint will be dismissed as to them.  The

result is different as to defendant Gonzalez, however, because Gonzalez admitted in its answer to

the plaintiff's complaint "that Plaintiff is paid on an hourly basis."  Gonzalez's Answer at ¶ 22.

"Statements in pleadings that acknowledge the truth of some matter alleged by an opposing party

are judicial admissions binding on the party making them."  *Ahghazali v. Sec'y of Health & Human

Serv.*, 867 F.2d 921, 927 (6th Cir. 1989).  Gonzalez's statement is "deliberate, clear and

unambiguous," and constitutes a judicial admission.  *See Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999).  Gonzalez is thus precluded from arguing that the defendant is a salaried employee for the purpose of the FLSA.  *Ferguson v. Neighborhood Hous. Serv. of Cleveland, Inc*., 780 F.2d 549, 550-51 (6th Cir. 1986) (applying rule of judicial admission made in pleadings in FLSA case).  Gonzalez filed a motion to amend its answer after oral argument of these motions.  Unless that motion is adjudicated it its favor, the admission is binding and precludes summary judgment for defendant Gonzalez because hourly workers cannot be found exempt under 29 U.S.C. § 213(a).

## B.

The plaintiff also brought claims against the defendants for violating his rights under the First Amendment based on allegations that he was forced to falsify his time records.  This claim lacks merit because the plaintiff has not alleged, and there is no evidence even remotely suggesting, that the defendants are government actors.  The First Amendment is only a restriction on government action.  For the plaintiffs' claim to succeed, the defendant must qualify as a state actor. "To constitute state action, 'the deprivation must be caused by the exercise of some right or privilege created by the State . . . or by a person for whom the State is responsible,' and 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.'"  *West v. Atkins*, 487 U.S. 42, 49 (1988).  The plaintiff all but conceded this point at oral argument, and the Court finds that count three of the complaint must be dismissed.

## C.

In count four of the complaint, the plaintiff reiterates his allegations that he was forced by Raytheon and Gonzalez to falsify his time records, and he alleges that these facts support a claim

for fraud and duress.  At oral argument, the Court stated its intention to dismiss this claim against Gonzalez because the plaintiff signed a contract that contained an abbreviated statute of limitations. In *Wineman v. Durkee Lakes Hunting & Fishing Club, Inc.*, 352 F. Supp. 2d 815 (E.D. Mich. 2005), this Court held that public policy does not forbid parties from contractually shortening the statute of limitations for claims other than FLSA claims.  *Id.* at 820 (observing that other "courts have pointed to statutory provisions that limit the time for bringing certain labor-related claims within six months as evidence that such a period is not inherently unreasonable").  The plaintiff has not shown that the six-month contractual statute of limitations is unreasonable in this case.  Because his claims accrued at the latest in April 2004 when he was fired, and he did not file his complaint until August 26, 2005, the claims against defendant Gonzalez (other than the FLSA claim) are barred and shall be dismissed.

Raytheon contends that the fraud claim must be dismissed against it because the plaintiff failed to plead the required elements with particularity as required by Rule 9(b), and the plaintiff has not established all the elements of a fraud claim under Michigan law.  In order to establish a claim for intentional fraud, Michigan law requires plaintiffs to plead and prove the following elements:

> (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery.

*Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813, 816 (1976); *see also Hord v. Envtl. Research Inst. of Michigan*, 228 Mich. App. 638, 642, 579 N.W.2d 133, 135

-34-

(1998), *rev'd on other grounds after remand*, 463 Mich. 399, 617 N.W.2d 543 (2000).  Failure to prove any one of these elements is fatal to the plaintiff's claim.  *Ibid.*

The essence of the plaintiff's claim in count four is that the defendants told him he would be disciplined if he accurately recorded his hours on a time card, which caused him to under-report his hours and thus receive less pay than he actually earned.  However, there is no dispute in the present record that the plaintiff's weekly pay did not vary based on hours worked, and the amount of his wages was constant regardless of time spent on the job.  The plaintiff's pay was based on a salary, not an hourly wage.  Moreover, the plaintiff has not alleged that the *defendants* made any false representations, only that *he* was allegedly told to make false representations.  Finally, the defendants' representatives acknowledged that the plaintiff was instructed to fill out forty-hour weekly time cards, although they assert that the purpose of the cards was to assist in internal accounting  and cost tracking.  The plaintiff has offered no evidence to refute those assertions.

The Court finds, therefore, that the plaintiff has not shown that the defendants made any statement that was false, or that he relied on a false representation, or that the representation was material to the determination of the plaintiff's compensation.  The defendants are entitled to summary judgment on court four of the complaint.

## D.

Lastly, the plaintiff alleges that the defendants breached a contract established by the policies set forth in the respective company handbooks for Gonzalez and Raytheon.  This claim must be dismissed as to defendant Gonzalez because it is time barred pursuant to the contractually-shortened statute of limitations discussed above.  Defendants Raytheon and Jackson argue that these claims should be dismissed because they are based on an employee handbook that the plaintiff never

received or read.  They also argue that the only claim that may stem from promises in a handbook is a wrongful discharge claim, not a claim based on pay rates.

In this case, even if the plaintiff is an exempt employee under the FLSA, the parties are free to contract to pay him an hourly wage with overtime rates for any hours worked over forty per week. Although the plaintiff is not claiming that he was entitled to a just-cause-only standard for termination, the cases discussing contracts based on handbooks are helpful.  An employer may enter into contractual relationships with their employees, which limit the employer's ability to fire an employee without a valid reason to do so.  Courts have recognized the following three ways by which a plaintiff can prove such contractual terms:  (1) proof of a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause; (2) an express agreement, either written or oral, regarding job security that is clear and unequivocal; or (3) a contractual provision, implied at law, where an employer's policies and procedures instill a "legitimate expectation" of job security in the employee.  *Lytle v. Malady*, 458 Mich. 153, 164, 579 N.W.2d 906, 911 (1998).  This third method of proving an employment contract is not available in a failure to pay case.  *Dumas v. Auto Club Ins. Ass'n*, 437 Mich. 521, 531, 473 N.W.2d 652, 656 (1991) (holding that "the 'legitimate expectations' doctrine of *Toussaint* does not follow traditional contract analysis. Therefore, it does not logically follow that *Toussaint* should be extended to the area of compensation.  Also, since employees' accrued benefits are protected by the presence of traditional contract remedies, there is no need to extend the expectations rationale to compensation").

In an express contract case, "[t]he essential elements of a valid contract are the following: '(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation.'"  *Hess v. Cannon Twp.*, 265 Mich. App. 582, 592,

-36-

696 N.W.2d 742, 748 (2005) (quoting *Thomas v. Leja*, 187 Mich. App. 418, 422, 468 N.W.2d 58 (1991)).

"'A contract implied in fact arises when services are performed by one who at the time expects compensation from another who expects at the time to pay therefor.'" *Reed v. Yackell*, 473 Mich. 520, 531, 703 N.W.2d 1, 7 (2005) (quoting *In re Spenger Estate*, 341 Mich. 491, 493, 67 N.W.2d 730 (1954)). "Relevant facts include 'the type of services rendered, the duration of the services, the closeness of the relationship of the parties, and the express expectations of the parties.'" *Matter of Estate of Morris*, 193 Mich. App. 579, 582, 484 N.W.2d 755, 756 (1992) (quoting *In re Lewis Estate*, 168 Mich. App. 70, 423 N.W.2d 600 (1988)). "An implied contract cannot be enforced where the parties have made an express contract covering the same subject matter." *Scholz v. Montgomery Ward & Co., Inc.*, 437 Mich. 83, 93, 468 N.W.2d 845, 849 (1991).

The "legitimate expectations" claim referred to in the complaint must be dismissed pursuant to *Dumas v. Auto Club Insurance Association* because such claims do not apply to compensation, which is what the plaintiff seeks here. Further, the plaintiff cannot prevail on an implied contract claim. "An implied contract cannot be enforced where the parties have made an express contract covering the same subject matter." *Scholz v. Montgomery Ward & Co., Inc.*, 437 Mich. 83, 93, 468 N.W.2d 845, 849 (1991). The parties here clearly had a contract regarding the plaintiff's compensation. Mr. Bonner sent the plaintiff an email offering him a salary of $1,616 per week plus vacation and benefits. Def. Raytheon's Mot. Summ. J. Ex. 4, Offer. The plaintiff accepted this offer. He cannot now claim that he had an implied contract regarding compensation.

The plaintiff cannot prevail on an express contract theory because he has offered no evidence of an agreement with defendants Raytheon or Jackson to pay him other than according to his salary,

which he acknowledged as having received.  To the extent that the plaintiff relies on the statement allegedly made by David  Bonner, "whatever arrangements you have had with Graham Jackson in the past, just continue that," the statement is too vague to constitute an enforceable promise. Moreover, that statement is not attributable to Raytheon because Bonner was Gonzalez' employee.

Finally, the plaintiff cannot establish a contract implied by Raytheon or Jackson because the undisputed facts do not support such a claim.  The plaintiff testified that he had an arrangement with Cosworth for compensatory time, but he never sought payment or other relief from that entity when his employment relationship with it terminated.  He testified that when he transferred his employment to Gonzalez he assumed that Gonzalez would honor the arrangement, but that expectation was not based on the conduct of Gonzalez, Raytheon, or Jackson.  To the extent that an implied agreement based on an employee handbook is enforceable, the plaintiff has failed to submit any evidence that the defendants' handbooks make such a promise.  Moreover, he has not submitted the handbook to which he refers, and he testified at his deposition that he was never given a Raytheon handbook, although he claims to have "reviewed one."  Def. Raytheon's Mot. Summ. J. Ex. 1, LaCourse Dep. at 160.  If Raytheon never gave the plaintiff a handbook, any promise contained in it could not have been directed at him.

The Court finds, therefore, that the defendants are entitled to summary judgment on count five of the complaint.

III.

-38-

The Court concludes that the undisputed evidence establishes that the plaintiff is an exempt employee, and therefore Raytheon and Jackson's motion for summary judgment will be granted on counts one and two of the complaint.  For the reasons discussed above, the Court finds that all defendants are entitled to judgment as a matter of law on the remaining counts.

Accordingly, it is **ORDERED** that the motion for summary judgment by defendants Raytheon Company and Graham Jackson [dkt # 15] is **GRANTED**.

It is further **ORDERED** that the motion for summary judgment by defendant GRS III, L.L.C., doing business as Gonzalez Contract Services [dkt # 13] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE** as to defendants Raytheon Company and Graham Jackson, and counts three, four, and five of the complaint are **DISMISSED WITH PREJUDICE** as to defendant GRS III, L.L.C., doing business as Gonzalez Contract Services.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: December 13, 2006

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 13, 2006.

s/Felicia M. Moses
FELICIA MOSES

-39-